IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kenneth Pinkelman,                                      Case No. 3:09CV1539

              Plaintiff

     v.                                                      ORDER

Commissioner of Social Security,

              Defendant

      In this appeal, I review defendant Commissioner of Social Security's (Commissioner) final decision denying plaintiff Kenneth Pinkelman's application for supplemental security income (SSI) and disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g).

      The Commissioner objects [Doc. 19] to the Magistrate Judge's Report and Recommendation (Magistrate's Report) [Doc. 18], which recommends I reverse the Commissioner's decision and remand the case for further proceedings. Based on a *de novo* review of the record, I sustain the Commissioner's objections and adopt the remainder of the Magistrate's Report affirming the Administrative Law Judge's (ALJ) decision.

**Procedural Background**

Pinkelman filed applications for both SSI and DIB on April 26, 2005. The Social Security Administration (Administration) denied the claims both initially and on reconsideration. ALJ Yvonne Stam held an administrative hearing on January 9, 2008. Pinkelman, accompanied by his father, Robert H. Pinkelman, appeared without an attorney, and the ALJ granted a continuance to allow Pinkelman to seek counsel. The ALJ held a second hearing on March 12, 2008, and heard testimony from Pinkelman, his sister Mary Ann Geckler and vocational expert Joseph Thompson. The ALJ issued a Notice of Decision – Unfavorable on April 8, 2008. On May 22, 2009, the Administration's Office of Hearings and Appeals denied Pinkelman's request for review, rendering the ALJ's decision the final judgment of the Commissioner.

Pinkelman sought judicial review of the Commissioner's decision in this court, leading to Magistrate Judge George J. Limbert's August 13, 2010 Report and Recommendation that Pinkelman's case be remanded to the ALJ for further factfinding, analysis, and articulation.

**Medical History**

Pinkelman graduated from high school having attended special education classes. Pinkelman worked in a factory making tubing for cars from February 1984, through January 1993. From 1994 to 2002, Pinkelman operated a fork lift and made car parts at another factory. Pinkelman has not engaged in substantial gainful activity since December, 2002.

Pinkelman has a history of health problems including: smoking addiction, alcoholism, cocaine addiction, diabetes, perforated bowel, hyperlipidemia, depression, asthma, and skin cancer. The Commissioner's objection to the Magistrate's Report relates only to Pinkelman's mental limitations, however, so I limit my summary of the evidence accordingly.

2

His father testified that Pinkelman is "slow" due to brain damage at birth. R. at 556. While in sixth grade, an administered a Wechsler IQ test determined Pinkelman to have a full scale IQ of 67. He has difficulty reading.

In December 2003, Terrence Mohler, Ph.D., evaluated Pinkelman and administered the Wechsler Adult Intelligence Scale III Test (WAIS III), the Wechsler Memory Scale III Test (WMS III), and the Kaufman and Wide Range Intelligence Tests. Dr. Mohler measured Pinkelman's Verbal Scale IQ at 68, his Performance Scale IQ at74, and his Full Scale IQ at 68. Pinkelman's WMS III scores ranged from 61-85, results reflecting "a generalized capacity for memory that was within the Borderline Classification and below." R. at 465. Pinkelman's reading word attack and comprehension were at the second and third grade levels. Dr. Mohler diagnosed borderline intellectual functioning, evaluated Pinkelman's global assessment of functioning (GAF)[1] at 65, and observed Pinkelman "appeared able to learn a simple routine job skill and seemed motivated toward employment." *Id.*

In January 2004, state agency psychologist Roy Shapiro, Ph.D., reviewed the file and assessed Pinkelman's mental Residual Functional Capacity[2] (RFC). His review revealed Pinkelman

---

[1] GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into an easily understandable general assessment of an individual's mental functioning. A GAF score between 51 and 60 "indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 (6th Cir. 2006)(unpublished disposition). A GAF score between 61 and 70 indicates "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders* (DSM IV) 34 (Am. Psychiatric Ass'n, 2000).

[2] RFC indicates an individual's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments." R. at 14.

3

to be mildly restricted in activities of daily living. He found Pinkelman had mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. Dr. Shapiro concluded that Pinkelman's functional abilities did not meet the criterion for the mental retardation listing and that he had no other severe problems.

In April 2004, Pinkelman saw treating physician John Evanoff, M.D., for an evaluation because he wanted to go on disability. Dr. Evanoff noted Pinkelman's overall decreased mental capacity, but told him that he would not sign off on papers for disability based on history of drug or alcohol abuse, as Pinkelman was not at the time using abusing drugs or alcohol.

Richard Davis, Ph. D., a consulting psychologist, evaluated Pinkelman in December 2004. Dr. Davis diagnosed Pinkelman with lower borderline intellectual functioning and psychosocial stressors related to his intellectual functioning. He evaluated Pinkelman's GAF at 60 and noted Pinkelman's employment history indicated his ability to remain employed in the proper setting.

Later in December 2004, Steven Meyer, Ph. D., a state agency psychologist, reviewed Pinkelman's file and made a mental RFC assessment. Based on his review, Dr. Meyer found Pinkelman to mildly restricted in activities of daily living.  He also believed Pinkelman had mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. Dr. Meyer concluded that Pinkelman could "understand, carry out, and remember simple task instructions." R. at 381.

In July 2005, Pinkelman saw consulting psychologist Roger Avery, Ed. S., as part of the disability determination process in his Social Security claim. Mr. Avery administered the WAIS III, WSM III, and Peabody Individual Achievement Test. He measured Pinkelman's Verbal Scale IQ at 63, his Performance Scale IQ at 70, and his Full Scale IQ at 67. Pinkelman's WSM scores ranged

4

from 45 to 74. His Peabody Individual Achievement Test results were "below what would be predicted based upon his WAIS III results." R. at 323. Noting Pinkelman's partial recovery from alcohol and cocaine dependency, his borderline intellectual functioning, and occupational and economic problems, Mr. Avery evaluated his GAF at 50-55. Assessing Pinkelman's work-related abilities, Mr. Avery concluded:

1) The claimant's mental ability to relate to others, including fellow workers and supervisors, is markedly impaired based on his mild mental retardation range of verbal intelligence. He would be able to relate sufficiently to coworkers and supervisors but only for simple, repetitive tasks.

2) The claimant's mental ability to understand, remember, and follow instructions is markedly impaired based on his mild mental retardation range of verbal intelligence, moderately impaired based on his borderline range of performance intelligence, and markedly impaired based on his mild retardation range of working memory.

3) The claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks is moderately impaired based on his borderline range of processing speed. He demonstrated problems of attention and concentration during today's clinical interview and psychological testing.

4) The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activities is markedly impaired. He shows mental limitations in the areas of relating and comprehending due to the effects of his mild mental retardation range of intellectual functioning.

5) The claimant does not have the mental ability to manage his funds. It appears at the present time it would be to his advantage for him to have a representative payee, who would be able to assist him with his benefits in his best interest.

R. at 324-25.

State agency psychologist Nancy McCarthy, Ph. D., reviewed Pinkelman's file in August, 2005, to render a mental RFC assessment. Dr. McCarthy noted Pinkelman suffered from depressive syndrome characterized by difficulty concentrating or thinking, along with learning disabilities and

5

borderline intellectual functioning. She found Pinkelman experienced mild restriction of activities of daily living as well as moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace. Observing the inconsistencies in Pinkelman's statements to evaluating consultants, Dr. McCarthy stated that Pinkelman was "partially credible." R. at 306. In her functional capacity assessment, R. at 309, Dr. McCarthy concluded:

> On 7/05 exam, he had an IQ of 63, GAF of 50 with DX of depression, LD [learning disability], BIF [borderline intellectual functioning.
>
> . . . His ability to follow instructions is fair. He was employed for 18 years with 8 as a factory worker. He did not appear to respond incorrectly to inquiries. He does household chores. He lives alone. He goes shopping with his father. He lets his father do the buying.
>
> His ability to sustain concentration is fair. He had no problems with attention span during the interview and testing.
>
> His social interaction is poor. He has no problem with people in authority. He keeps in contact with his siblings and father.
>
> Claimant can adapt to changes in work environment if explained to him. He would have no problem if duties are routine and predictable. He could become frustrated by complex tasks and this could cause some stress. He does not handle money. He can handle simple, routine tasks on a daily basis.

### Standard for Disability

To determine disability, the ALJ engages in a five-step sequential evaluation. 20 C.F.R. § 404.1520. The ALJ considers whether: 1) claimant is engaged in work that constitutes substantial gainful activity; 2) claimant is severely impaired; 3) claimant's impairment meets or equals the Secretary of Health and Human Services's Listing of Impairments; 4) claimant can perform past relevant work; and 5) other jobs exist in significant numbers to accommodate claimant if claimant cannot perform his past relevant work, given his RFC, age, education and past work experience. *Id*.

The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002).

## ALJ Findings

The ALJ found:

1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2) The claimant has not engaged in substantial gainful activity since December 8, 2002, the alleged onset date.

3) The claimant has the following severe impairment: borderline intellectual functioning.

4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5) . . . [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine tasks in a work setting that is relatively unchanging both in setting and process from day to day. He is limited to brief and superficial contact with others and no work with the general public. He cannot work at a fast pace, and the work should be performed in a way that neither reading nor writing is essential to performing the job duties.

6) The claimant is unable to perform any past relevant work.

7) The claimant was born on November 7, 1954, and was 48 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.

8) The claimant has at least a high school education and is able to communicate in English.

9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills.

7

10) Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11) The claimant has not been under a disability, as defined in the Social Security Act, from December, 2002, through the date of this decision.

R. at 15-24 (internal citations omitted).

## Standard of Review

I review *de novo* those portions of the Magistrate's Report to which either party objects. *See* 28 U.S.C. § 636(b)(1).

The Social Security Act, 42 U.S.C. § 405(g), allows limited judicial review of the Commissioner's decision. I "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). I must affirm the Commissioner's decision if: 1) substantial evidence supports the ALJ's findings; and 2) the ALJ applied the proper legal standards. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see also Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The substantial evidence standard, though deferential, is not trivial. *TNS, Inc. v. N.L.R.B.*, 296 F.3d 384, 394-395 (6th Cir. 2002). In determining whether substantial evidence supports the ALJ's findings, I view the record as a whole, *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980), and "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487 (1951); s*ee Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978). Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard*, *supra*, 889 F.2d at 681 (citing *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938)). If substantial evidence supports it, I must affirm the ALJ's decision, even if I would have decided the matter differently or substantial evidence also supports the opposite conclusion. 42 U.S.C. § 405(g); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986), *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

## Discussion

The Commissioner objects to the Magistrate's recommendation that the case be remanded for specific consideration of Mr. Avery's opinion. The Magistrate found that the ALJ's decision to give less weight to Mr. Avery's opinion rests on a mischaracterization of the record. The Commissioner disagrees, arguing that the ALJ: 1) correctly interpreted Dr. McCarthy's opinion as discounting Mr. Avery's conclusions; and 2) had independent reasons for discounting Mr. Avery's opinions, and therefore substantial evidence supports her decision.

The Magistrate's Report observed that the ALJ did consider Mr. Avery's findings relating to Pinkelman's work-related abilities in making her RFC analysis. Specifically, the ALJ discounted Mr. Avery's opinion related to concentration, persistence, and pace because Dr. Davis assessed no limitations in this regard, and Pinkelman's work history supported Dr. Davis's conclusion. The ALJ credited Mr. Avery's opinion of Pinkelman's social functioning and limited the RFC accordingly. In considering opinions in the record, the ALJ gave state agency psychologist Dr. McCarthy's opinion the greatest weight. The ALJ "concurred with Dr. McCarthy in giving [Mr. Avery's] opinion limited weight . . . because it is not consistent with other evidence in the record, and is undermined by questions about the claimant's credibility as a historian." R. at 22.

In general, an ALJ must "give more weight to the opinion of a source who has examined

9

[the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(d)(1). Mr. Avery examined Pinkelman; Dr. McCarthy did not.

Other considerations may justify giving less weight to an examining source, particularly the consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."), *Ealy v. Comm'r Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) ("In order to determine how much weight to give [a nontreating, examining source's] opinion, the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty."). I will defer to the ALJ's decision to give more weight to the opinion of one source over another so long as substantial evidence supports the decision or there is evidence that the rejected opinion is inconsistent with other medical evidence in the record. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-92 (6th Cir. 2004) (explaining that the weight given to physicians' opinions depends on the extent they are supported by objective medical signs and laboratory findings and are consistent with the record as a whole).

### 1. The ALJ's Interpretation of Dr. McCarthy's Report

After reviewing Dr. McCarthy's summary of the inconsistent information Pinkelman gave to consultative examiners, the ALJ stated that "Dr. McCarthy therefore did not give great weight to Mr. Avery's conclusions." R. at 21-22. I decline to adopt Commissioner's belief that "the implications of Dr. McCarthy's comments about Plaintiff's statements to Dr. [sic] Avery are unmistakable, since she proffered an assessment less restrictive than Dr. Avery's." [Doc. 19, at 2].

The parties agree that Dr. McCarthy never addressed Mr. Avery's opinions or conclusions.

10

Dr. McCarthy merely commented on Pinkelman's statements to Mr. Avery. Dr. McCarthy articulated no reason why Pinkelman's subjective reporting would have affected Mr. Avery's conclusions—conclusions specifically based on the intelligence test results and Mr. Avery's observations. R. at 325. I agree with the Magistrate that the ALJ mischaracterized Dr. McCarthy's report as it related to Mr. Avery's opinion. Dr. McCarthy's report therefore is not substantial evidence that Mr. Avery's report should be given little weight or that it is inconsistent with the record.

### 2. The ALJ's Independent Reasons
### for Giving Mr. Avery's Opinion Limited Weight

The relevant question, however, is not whether Dr. McCarthy adequately considered Mr. Avery's findings, but whether the ALJ adequately considered them in reaching her decision. The ALJ explained her decision to give little weight to Mr. Avery's opinion as follows:

> The only opinion suggesting that the claimant's [borderline intellectual functioning] causes greater limitations [than the ALJ's RFC assessment] is the assessment of work-related abilities from Mr. Avery. The undersigned concurs with Dr. McCarthy, however, in giving this opinion limited weight, however, because is not consistent with other evidence in the record, and is undermined by questions about the claimant's credibility as a historian. The undersigned notes that in addition to the inconsistencies mentioned by Dr. McCarthy, the claimant gave Mr. Avery other incorrect information, such as stating that he had never had any surgeries, when the record shows that he had surgery for a perforated bowel in the early 1990s and had the colostomy reversed in 1995. This pattern of inaccuracies calls into question the credibility of the entire interview with Mr. Avery and perhaps even the intelligence test results.

R. at 22.

Although the ALJ's sentence construction is arguably ambiguous, I agree with Commissioner that the ALJ's stated reasons for discounting Mr. Avery's opinion go beyond the mere fact that Dr. McCarthy did not endorse the opinion. The ALJ gave Mr. Avery's report limited

weight because she found it to be inconsistent with other evidence in the record and undermined by questions about Pinkelman's credibility.

## A. Inconsistency

The ALJ stated that Mr. Avery's opinion was "not consistent with other evidence in the record." R. at 22. The ALJ's subsequent discussion does appear to conflate Pinkelman's inconsistency with that of Mr. Avery's opinion with the record. The ALJ's discussion of whether Pinkelman's impairment meets or equals the Secretary of Health and Human Services's Listing of Impairments, however, shows that she specifically considered the consistency of Mr. Avery's conclusions with the record as a whole. The ALJ found that Mr. Avery's conclusions regarding concentration, persistence or pace were inconsistent with Dr. Davis's assessment and with Pinkelman's work history. R. at. 19. The ALJ adopted Mr. Avery's assessment of Pinkelman's social functioning in her RFC assessment, *id.*, again showing that she considered Mr. Avery's opinion in light of the record as a whole. The ALJ noted that Pinkelman attends Alcoholics Anonymous (AA) meetings nightly and had not used drugs or alcohol for two years, information not available to Mr. Avery in making his assessment.

The ALJ considered the reports and opinions of other evaluating physicians and psychologists, and chose to give the greatest weight to Dr. McCarthy's opinion because it is "consistent with—and to some extent more restrictive than—the earlier opinions from State agency psychologists, and [evaluating sources] Dr. Mohler and Mr. [sic] Davis." R. at 22. The Sixth Circuit in *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 507 (6th Cir. 2006) (unpublished disposition), upheld an ALJ's decision to favor some examining physicians' opinions over another where the ALJ failed to explain his reasons. Here, the ALJ's opinion explains her

reasons for giving less weight Mr. Avery's report compared to other medical opinions. Substantial evidence thus supports the ALJ's decision that Mr. Avery's opinion was inconsistent with the record as a whole.

### B. Undermined by Questions About Credibility

The record leaves no doubt that Pinkelman is an unreliable historian. Dr. McCarthy noted several significant inconsistencies in Pinkelman's statements to his evaluating consultants, and the ALJ identified several additional inaccuracies in Pinkelman's statements to Mr. Avery. But it does not follow that those inconsistencies, even if intentional, undermined the results of the WAIS III or Mr. Avery's conclusions as to Pinkelman's work-related abilities.

The Commissioner asserts that *Smith v. Commissioner of Social Security*, 482 F.3d 873 (6th Cir. 2007), supports the ALJ's weighing of Mr. Avery's assessment. In *Smith*, the Sixth Circuit upheld the ALJ's decision to decline to give treating physicians' opinions controlling weight where the "doctors formed their opinions *solely* from Smith's reporting of her symptoms and her conditions, and the ALJ found that Smith was not credible." 482 F.3d at 877 (emphasis added).

Unlike the doctors in *Smith*, however, Mr. Avery drew his conclusions from his observations of Pinkelman and on Pinkelman's intelligence test results, *not* from Pinkelman's reporting. This fact was specifically recognized by the ALJ in her opinion: "[Mr. Avery's] discussion of work-related abilities specifically attributed limitations to the claimant's cognitive deficits." R. at 16. A court in this district previously explained that *Smith* does not stand for the proposition that an ALJ's finding a claimant not credible will suffice in the face of a strong medical record. *Winning v. Commissioner of Social Security*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009). Mr. Avery's WAIS III testing yielded measurements consistent with Dr. Mohler's results. Neither Mr. Avery nor Dr. McCarthy

13

gave any indication that subjective reporting had a bearing on the tests in this case. There is no substantial evidence that Pinkelman's reporting affected the intelligence test results or the conclusions Mr. Avery based on them.

The ALJ's decision, however, was not directed at the intelligence test results or the conclusions Mr. Avery reached about Pinkelman's work-related abilities. Although the ALJ noted that Pinkelman's inconsistencies "perhaps even" throw into doubt the intelligence test results, her ultimate decision considered Mr. Avery's entire report and its consistency with the record as a whole.

As discussed above, the ALJ specifically considered Mr. Avery's conclusions as to Pinkelman's work-related abilities, even adopting his findings as to social functioning. And Mr. Avery's entire report includes findings not only inconsistent with the reports of other evaluative consultants but also based on information Dr. McCarthy and the ALJ found inaccurate or not credible.

Mr. Avery relied on Pinkelman's report of hallucinations in diagnosing "major depressive disorder, severe with psychotic features." R. at 324. Had he known Pinkelman attended nightly AA meetings, Mr. Avery may have diagnosed differently. Pinkelman's representations likely affected Mr. Avery's assessment of a GAF of 50-55, a score notably lower than other evaluations in the record. While I am sympathetic to Pinkelman's argument that his mental deficiencies, rather than any purposeful deceit, may be the source of the inconsistencies noted by the ALJ and Dr. McCarthy, innocent misrepresentations might well affect medical opinions. Substantial evidence supports the ALJ's determination that the inconsistencies "call into question the credibility of the entire interview with Mr. Avery." R. at 22.

14

The ALJ properly treated Mr. Avery's opinion, and considered his conclusions regarding work-related impairments. Because substantial evidence supports the ALJ's decision to give less weight to Mr. Avery's report, I affirm the ALJ's judgment.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT defendant's objections to the Report and Recommendation of the United States Magistrate Judge be, and the same hereby are, sustained.

So ordered.

<u>s/James G. Carr</u>
U.S. District Judge